67 Cal.Rptr.3d 721 (2007)
156 Cal.App.4th 930
In re Michael MONTGOMERY, on Habeas Corpus.
No. B192544.
Court of Appeal of California, Second District, Division Six.
November 7, 2007.
*723 Rich Pfeiffer, for Petitioner Michael Montgomery.
Edmund G. Brown, Jr., Attorney General, Mary Jo Graves, Chief Assistant Attorney General, Julie L. Garland, Senior Assistant Attorney General, Anya M. Binsacca, Supervising Deputy Attorney General, Collette C. Cavalier, Deputy Attorney General, for Respondents Arnold Schwarzenegger, Governor, State of California; Kathy Mendoza-Powers, acting Warden, Avenal State Prison; and James E. Tilton, Secretary, California Department of Corrections and Rehabilitation.
*722 PERREN, J.
The Governor appeals from a superior court order granting a petition for writ of habeas corpus filed by Michael Montgomery and ordering that he be released.[1] The superior court determined that Governor Arnold Schwarzenegger's reversal of the Board of Parole Hearings' (Board) decision finding Montgomery suitable for parole was based solely on the nature of the commitment offense and was not supported by "some evidence." The Attorney General urges us to reverse the superior court's decision, arguing that the nature of the commitment offense provides some evidence supporting the Governor's reversal of the Board's decision.
Understanding that the standard of review of the Governor's decision is whether there is "some evidence" (In re Rosenkrantz (2002) 29 Cal.4th 616, 626, 664-667, 128 Cal.Rptr.2d 104, 59 P.3d 174) to support his denial of parole, we confront the further question of whether the Governor's decision can withstand "especially close scrutiny" (In re Scott (2005) 133 Cal. App.4th 573, 595, 34 Cal.Rptr.3d 905) inasmuch as the denial rests solely on the gravity of the offense. We conclude that it does not, and that to hold otherwise could *724 render the immutable fact of the nature of the commitment offense a permanent denial of parole.
Accordingly, we affirm the order of the trial court.

FACTUAL AND PROCEDURAL HISTORY

1. The Commitment OffenseMurder in the Second Degree
On November 6, 1985, Montgomery was at the home of a drug dealer and friend, Darrell Haigwood, with another friend, Charles Reed. Haigwood asked Montgomery to kill Edward Recinella, whom Haigwood said was an informant. Montgomery refused. Reed volunteered to do so. Haigwood promised to pay Montgomery $10,000 to drive Reed to carry out the shooting. Montgomery agreed. The three men briefly discussed a plan to shoot Recinella.
A short time later, Recinella arrived at the house. He was told to go with Montgomery and Reed to collect a drug debt. At some point before reaching their destination, Recinella asked Montgomery to pull over to the side of the road so he could urinate. All three men exited the car. Montgomery returned to the car; Reed did not. As Recinella urinated, Reed shot and killed him.
After the murder, Reed got back into the car with Montgomery. They drove to the coast and threw the gun into the ocean. They then drove back to Haigwood's house and discussed the successful completion of their plan. Haigwood never paid Montgomery.
Recinella's body was found the next day approximately six feet from Huasna Road in a rural area of Arroyo Grande. The body had three gunshot woundsone to the rear of the left leg, one to the right hip, and a fatal one through the back of the neck. Because the neck wound contained dry brown grass, it was concluded that Recinella was already on the ground when the fatal shot was fired.
Nineteen months later, Montgomery was detained on an unrelated charge. During a videotaped police interrogation, Montgomery admitted his involvement in Recinella's murder. In his confession, Montgomery said he had refused to shoot the victim himself. Montgomery said Haigwood hired him that evening to drive the car so that Reed could shoot the victim. Montgomery admitted agreeing to drive the car for a payment of $10,000. Montgomery also admitted he knew that Reed would "take care of Recinella that evening.
Pursuant to a plea bargain, Montgomery pled guilty to second degree murder. As part of the bargain, Montgomery agreed to testify against Reed and Haigwood. Montgomery received the statutory and indeterminate sentence for second degree murder of 15 years to life. (Pen.Code, § 190, subd. (a).)

2. History of Parole Hearings
Beginning in 1996, Montgomery had seven parole hearings before the Board found him suitable for release in 2005. We offer a brief summary of the hearings and their results.
Psychological evaluations from 1991, 1994 and 1996 show that Montgomery had a long history of alcohol and substance abuse. Prior to the commitment offense, Montgomery was arrested several times on alcohol and drug-related charges. Montgomery's record showed he had no other arrests, either as a juvenile or an adult.
The evaluations note that in 1989, Montgomery *725 received a "CDC 115"[2] for drinking. He received a second CDC 115 in January 1994 for having a calendar on his wall with bikini-clad girls on motorcycles. Montgomery received no other CDC 115's during his incarceration.
The evaluations indicate that Montgomery participated in Alcoholics Anonymous (AA), completed several educational and self-help programs, and received good work reports from his supervisors.
The psychologist who examined Montgomery in 1991 concluded that Montgomery "manifested genuine responsibility for the crime from the very beginning" and his violence potential appeared to be "low average." The psychologist who examined Montgomery in 1994 concluded that Montgomery's violence potential appeared to be low if he remained sober. The psychologist who examined Montgomery in 1996 concluded: "At the time of [the] offense, violence potential outside a controlled setting was considered to be greater than average, but at present is estimated to have decreased, in that he has gained in maturity, and his alcohol and drug use are currently in remission."
At the 1996 hearing, the Board received a letter from the district attorney's office commending Montgomery for cooperating in the investigation of Haigwood and Reed. The letter stated: "Without his cooperation, this case, in our belief, would have remained unsolved." The district attorney recommended that the Board consider Montgomery suitable for parole and set a date for his release.
The Board found Montgomery would pose an unreasonable risk of danger to society if released and denied parole. It did so because: (1) He willingly participated in the commitment offense and did nothing to contact law enforcement until he was subsequently arrested, (2) he had an unstable social history of alcohol abuse and numerous drunk driving arrests and continued to drive while his license was suspended, (3) he continued to be involved with drugs and the drug culture after the murder, and (4) he had not completed vocational training.
Montgomery's next parole hearing was in 1997. The life prisoner evaluation noted that Montgomery had remained discipline-free and continued to attend AA on a regular basis. The evaluation stated that his vocational instructor and job supervisor reported he was skillful, dependable, and a "model worker." The evaluation noted: "Montgomery continues to have a consistent positive work record which he has maintained since the first available documentation dated 11/11/89." His future plans included living with his father and stepmother, working in construction, and continuing to be active in AA. The evaluation concluded: "Violence potential appears to be low if Montgomery abstains from alcohol, drug use, and is able to establish a positive social support network upon release.... Considering the commitment offense, prior record and prison adjustment, this writer believes the prisoner would pose a low degree of threat to the public if released from prison at this time."
The 1997 psychological evaluation noted that Montgomery had not abused substances for many years, currently did not show impulsivity and poor judgment that would put him at increased risk to again develop an abusive pattern, and had gained much insight and matured greatly. The evaluation concluded: "There are no current indicators of a psychological problem that would interfere with successful parole. [¶] ... He does not show any *726 psychological features that would increase his risk of future violence above that of the normal population. [¶] ... He is not considered to be at an increased risk for future substance abuse based on his added insight and maturity."
After the 1997 hearing, the Board found Montgomery not suitable for parole because (1) the crime was an execution-style murder and Montgomery was involved in its planning and execution, (2) he had a history of prior drug and alcohol abuse and had antisocial tendencies, and (3) he lacked sufficient programming within the institution.
Additional parole hearings were held in 1999, 2001, 2002 and 2003. The evaluations prepared for those hearings noted Montgomery's continued involvement in AA, his participation in many other self-help programs, and his continued vocational education. The psychologist who evaluated Montgomery in 1999 concluded that Montgomery "presents a very low level of risk inside a controlled setting. There are no mental health indicators that would put him at risk in the general population for increased potential for violence."
Montgomery's life prisoner evaluation for 2001 stated that he admitted lying to himself for years about not knowing the murder was going to happen. The evaluation also noted that Montgomery remained discipline-free, had worked in several vocational programs, and received satisfactory to above-average work reports. The evaluation concluded that Montgomery "would pose a low degree of threat to the public if released from prison at this time, only providing he remain drug and alcohol free. Should he resume drug and/or alcohol usage, this writer believes his degree of threat to the public and himself could be high."
The evaluations prepared for the 2003 hearing contained little new information except to report that Montgomery remained discipline-free, continued to participate in AA and other self-help programs, and continued to receive vocational training. The life prisoner evaluation concluded that "this writer believes Montgomery would probably pose a moderate degree of threat to the public, if released from prison at this time." The 2003 mental health evaluation concluded that Montgomery "poses a low likelihood to become involved in a violent offense if released." (Italics omitted.)
At the 2003 hearing, Montgomery expressed remorse for the crime. He indicated he had job offers when he was released and had applied for acceptance into a sober living facility. The Board commended Montgomery on his progress in prison but denied parole based on the commitment offense and the need to maintain the gains made in prison over an extended period of time.
Each hearing resulted in a denial of parole with the Board finding that Montgomery posed an unreasonable risk of danger. It gave one or more of the following reasons for denial after each hearing: (1) The crime was carried out in an especially cruel and callous manner, demonstrating an exceptionally callous disregard for human suffering; (2) his previous record indicated an escalating pattern of criminal conduct and failure of previous grants of probation; (3) he had not sufficiently completed self-help and therapy programming, especially those relating to alcohol abuse; (4) a letter from the San Luis Obispo County Sheriffs Department opposed parole; and (5) Montgomery was more knowledgeable about the crime than he admitted and did not confess until he was later arrested for another crime.
Montgomery received another parole hearing in 2004. The life prisoner evaluation *727 stated that Montgomery continued "to display an ability to program positively within a controlled setting and has progressively and consistently attempted to better himself." The evaluation noted that he regularly attended AA meetings, pursued higher educational goals, and had been involved in vocational programs during the entire period of incarceration. He had no history of violent offenses and had engaged in no violent offense while incarcerated. It concluded: "Montgomery does not appear to be a potential violent repeat offender, but this is only if he continues to abstain from all alcohol and drugs. [T]his writer believes that Montgomery would pose a low degree of threat to the public if released from prison at this present time." There is no updated psychological evaluation in the record.
At the 2004 hearing, the Board again commended Montgomery on his progress. The Board noted it had received a letter from Detective Neufeld of the San Luis Obispo County Sheriffs Department, who investigated the commitment offense, stating: "Due to the very nature of his act I do not believe that Mike Montgomery should be released back into society."
Once again the Board denied parole. It concluded that Montgomery presented an unreasonable risk of danger based on (1) the nature of the commitment offense, (2) Montgomery's prior criminal history, (3) the commission of two additional crimes after the commitment offense, and (4) the need for further participation in self-help programs.

3. Petition for Writ of Habeas Corpus
Montgomery filed a petition for writ of habeas corpus requesting that the superior court reverse the Board's decision. On December 15, 2004, the trial court issued a lengthy order granting Montgomery's petition. The court remanded the case to the Board to conduct a new hearing.

4. Hearing after Remand
The hearing after remand was held January 27, 2005. At the hearing, the Board stated that Montgomery's file contained a letter from the district attorney's office indicating "vigorous support for ... release," a letter from Lieutenant Basti of the San Luis Obispo Sheriffs Department in opposition to parole, and letters from relatives of the murder victim written in 2002, requesting that parole be denied. No updated life prisoner or psychological evaluations are contained in the appellate record.
After this hearing, the Board found Montgomery suitable for parole because he had (1) no juvenile record; (2) enhanced his ability to function within the law upon release through education programs and self-help programs, vocational programs, and institutional job assignments; (3) been involved in AA on a continuous basis since 1990; (4) only two disciplinary infractions while incarcerated; (5) no significant adult criminal history other than the commitment offense; (6) realistic parole plans, including family support and a job offer; (7) shown signs of remorse and indicated he understood the magnitude and nature of the offense and accepted responsibility for the offense; and (8) his psychological evaluations had been positive and indicated a low probability of violence if released.
The Governor reversed the Board's decision, concluding that Montgomery required a longer period of incarceration to protect the public because he had participated in the murder of the victim solely for financial gain and the murder was premeditated.

*728 5. The Second Petition for Writ of Habeas Corpus

Montgomery filed a second petition for writ of habeas corpus in the superior court on July 15, 2005. The superior court again granted the petition, finding there was insufficient evidence that the commitment offense was more aggravated or violent than that minimally necessary to sustain a conviction for second degree murder.[3]

6. The Governors Appeals
The Governor filed a notice of appeal and a petition for writ of supersedeas and request for immediate stay of the superior court's order in this court. On July 27, 2006, we granted a temporary stay. We denied the petition and dissolved the temporary stay on August 1, 2006.
The Governor then filed a petition for review and request for stay in the California Supreme Court on August 3, 2006. After initially ordering a temporary stay, the Supreme Court denied the petition for review and ordered its temporary stay dissolved on August 1, 2006.
Montgomery is currently on parole.

7. The Governor's Decision

The Governor's June 16, 2005, decision reversing the Beard's grant of parole states in part:
"[Montgomery] lias made efforts to address his history of substance-abuse.... [H]e has consistently participated inpreventative-substance-abuse programming .... Mr. Montgomery has remained discipline-free since; 1994, has improved his vocational skills ... and has held several skilled institutional jobs. He has ... participated in self-help and therapy programs .... Mr. Montgomery's many efforts to improve his likelihood of success upon parole are positive factors supporting his parole.... [H]e does have confirmed plans for parole to live at a sober living facility ....
"Despite some creditable gains in prison, I cannot dismiss the gravity of the horrible crime Mr. Montgomery committed. Although he maintains he never received the $10,000 he was promised, he clearly committed the murder based on the promise of money. The record before me indicates that Mr. Montgomery did not have any problems with, or even know, Mr. Recinella. Mr. Montgomery's participation in this brutal and senseless crime was for the sole, despicable purpose of getting paid.
"In addition to the motive for the crime, the facts of the crime itself make this an especially grave second-degree murder. Within minutes of accepting the offer of money to kill Mr. Recinella, Mr. Montgomery and Mr. Reed left the house with the victim to carry out the murder. As planned, Mr. Montgomery did the driving. When Mr. Recinella asked him to stop the car, Mr. Montgomery obliged and pulled over. As he told his 2001 Life Prisoner evaluator, Mr. Montgomery knew that Mr. Recinella was going to be murdered. Mr. Reed [sic] was actually in the process of urinating when he was shot three times. According to the probation officer's report, he was hit in the leg, the hip, and the back of the neck. Moreover, evidence from the autopsy supports the theory that Mr. Recinella was lying on the ground when he was shot execution-style in the neck. After the shooting, Mr. Montgomery and his crime partner left Mr. Recinella's dead body on the side of the road and drove off to destroy evidence and to let Mr. Haigwood *729 know that they had successfully completed the crime. This was a cold premeditated murder committed for financial gain, the facts of which go well beyond the minimum necessary for a second-degree murder conviction. The gravity alone of this monstrous murder is sufficient for me to conclude that Mr. Montgomery poses an unreasonable risk to the public's safety. The San Luis Obispo County Sheriffs Office apparently agrees, having opposed Mr. Montgomery's parole in a 2004 letter to the Board based on the `very nature' of the murder he committed.
"The record before me indicates that Mr. Montgomery now accepts responsibility and is remorseful for Mr. Recinella's murder. He has received positive evaluations from mental-health and correctional professionals in recent years, and has made some commendable gains during his 18-year incarceration. Moreover, I acknowledge past letters of support for Mr. Montgomery from the San Luis Obispo County District Attorney's Office. But the standard by which I am governed is whether I believe Mr. Montgomery would pose an unreasonable risk of danger to society if released from prison at this time. And after carefully considering the very same factors as the Board is required to consider, I find the gravity of the second-degree murder committed by Mr. Montgomery presently outweighs the positive factors supporting his release."

DISCUSSION

1. Statutory Framework
Our state Constitution provides that gubernatorial review of a parole determination must be made "on the basis of the same factors which the parole authority is required to consider." (Cal. Const., art. V, § 8, subd. (b).)
The Board's parole decisions are governed by Penal Code section 3041 [4] and Board regulations. (Cal.Code Regs., tit. 15, § 2230 et seq.)[5] The Board "shall normally set a parole release date" one year prior to the inmate's minimum eligible parole release date and shall set the date "in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public ...."(§ 3041, subd. (a).)
Section 3041, subdivision (b) provides a release date must be set "unless [the Board] determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual...."
Section 2402 of the California Code of Regulations sets forth the various factors to be considered by the Board in carrying out the mandates of the statute. These regulations are designed to guide the Board's assessment of whether the prisoner poses "an unreasonable risk of danger to society if released from prison," and thus, whether he or she is suitable for parole. (Cal.Code Regs., § 2402, subd. (a).) Subdivision (b) directs the Board to consider "[a]ll relevant, reliable information available to the panel ... in determining suitability for parole.... Such information shall include the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after *730 the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release. Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability."
The regulation then provides a detailed list of factors tending to show unsuitability[6] or suitability[7] for parole. (Cal.Code Regs., § 2402, subds. (c), (d).) The specified unsuitability and suitability factors are "general guidelines" only. (Ibid.) The Board is expected to consider "[a]ll relevant, reliable information available.... Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability." (Id., § 2402, subd. (b).) "Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the, prisoner will pose an unreasonable risk of danger to *731 society if released from prison." (Id., subd. (a).)
The Governor's decision to reverse the Board's grant of parole must "reflect[] due consideration of the specified factors as applied to the individual prisoner in accordance with applicable legal standards...." (In re Rosenkrantz, supra, 29 Cal.4th 616, 677, 128 Cal.Rptr.2d 104, 59 P.3d 174.)

2. Standard of Review
"Parole release decisions have always been within the exclusive province of the executive branch." (In re Arafiles (1992) 6 Cal.App.4th 1467, 1487, 8 Cal. Rptr.2d 492.) Thus, the standard of review we employ in considering the Governor's parole decisions is extremely deferential. We consider only "whether the decision is supported by `some evidence.'" (In re Rosenkrantz, supra, 29 Cal.4th 616, 625, 128 Cal.Rptr.2d 104, 59 P.3d 174.) A court may not vacate the decision simply because it disagrees with the assessment of the Governor. (Id. at p. 677, 128 Cal.Rptr.2d 104, 59 P.3d 174.) The decision must be "devoid of a factual basis" to be overturned. (Id. at p. 658, 128 Cal.Rptr.2d 104, 59 P.3d 174.)
Because the overarching consideration is public safety, the test in reviewing the Board's decision denying parole "`is not whether some evidence supports the reasons [the Board] cites for denying parole, but whether some evidence indicates a parolee's release unreasonably endangers public safety.'" (In re Barker (2007) 151 Cal.App.4th 346, 366, 59 Cal.Rptr.3d 746, italics omitted.)
Court review of a Governor's decision ensures, among other due process rights, that the decision be supported by some evidence, the same standard for reviewing Board decisions. "[T]he voters in adopting the constitutional provision placed substantive limitations upon the Governor's exercise of that judgment and discretion. The provision mandates that the Governor consider only the same factors that may be considered by the Board. Having chosen to review a parole decision, the Governor lacks discretion to disregard this requirement, which distinguishes the Governor's parole review authority from his authority to grant pardons and commutations. Because this requirement gives rise to a liberty interest protected by due process of law, and because due process of law requires that a decision considering such factors be supported by some evidence in the record, the Governor's decision is subject to judicial review to ensure compliance with this constitutional mandate." (In re Rosenkrantz, supra, 29 Cal.4th 616, 663-664, 128 Cal.Rptr.2d 104, 59 P.3d 174.)

3. The Governor's Decision Is Not Supported by "Some Evidence"
While the Governor's discretion in reviewing parole suitability determinations is very broad, it is not absolute. The requirement of procedural due process embodied in the California Constitution (Cal. Const., art. I, § 7, subd. (a)) places some limitations upon that discretion. (In re DeLuna (2005) 126 Cal.App.4th 585, 591, 24 Cal.Rptr.3d 643.) In exercising his discretion, the Governor, like the Board, is constrained by the procedures specified by statute. The precise manner in which the specified factors relevant to parole suitability are considered and balanced is within the Governor's discretion, but his decision must reflect an individualized consideration of all the specified criteria and it cannot be arbitrary or capricious. (In re Rosenkrantz, supra, 29 Cal.4th 616, 677, 128 Cal.Rptr.2d 104, 59 P.3d 174; In re Scott, supra, 133 Cal. App.4th 573, 590-591, 34 Cal.Rptr.3d 905.)
Our Supreme Court has held that the circumstances of the prisoner's offense *732 alone may support a finding of unsuitability. (In re Rosenkrantz, supra, 29 Cal.4th 616, 682, 128 Cal.Rptr.2d 104, 59 P.3d 174.) But it is necessary to remember that "denial of parole based upon the nature of the offense alone might rise to the level of a due process violationfor example where no circumstances of the offense reasonably could be considered more aggravated or violent than the minimum necessary to sustain a conviction for that offense." '(Id. at p. 683, 128 Cal.Rptr.2d 104, 59 P.3d 174.)
Denial of parole where there are no circumstances that could be considered more violent or aggravated than the minimum necessary to sustain a conviction for that offense "would be inconsistent with the statutory requirement that a parole date normally shall be set `in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public....' (Pen.Code, § 3041, subd. (a).) `The Board's [and the Governor's] authority to make an exception [to the requirement of setting a parole date] based on the gravity of a life term inmate's current or past offenses should not operate so as to swallow the rule that parole is "normally" to be granted.'" (In re Rosenkrantz, supra, 29 Cal.4th 616, 683, 128 Cal.Rptr.2d 104, 59 P.3d 174.)
The Supreme Court in In re Dannenberg (2005) 34 Cal.4th 1061, 1098, 23 Cal. Rptr.3d 417, 104 P.3d 783, cautioned that an unsuitability determination must be predicated on "some evidence that the particular circumstances of [the prisoner's] crimecircumstances beyond the minimum elements of his convictionindicated exceptional callousness and cruelty with trivial provocation, and thus suggested he remains a danger to public safety."
These rules are easily applied to initial parole suitability decisions. As time passes and the number of parole denials increase, however, the circumstances of the offense that at first supported a decision to deny parole become increasingly attenuated. Unquestionably there are those cases that are paradigms for the Rosenkrantz/Dannenberg formulation cases involving no more than the minimum elements of the crime to support the conviction and, conversely, cases where the facts of the commitment offense are so egregious that continued reliance on them to deny parole would not constitute a denial of due process even after numerous parole hearings. Most cases, as the one we review here, sit somewhere in between. The question with which we are confronted is when, over time, do the circumstances of the commitment offense diminish in weight so they are no longer sufficient to bar parole. Our Supreme Court has not yet provided clear guidance as to when the immutable facts of the commitment offense, standing alone, cease to be a permissible factor in parole decisions where, as here, an inmate has met or exceeded every suitability factor set forth in the regulations.
The Governor determined Montgomery's crime was more egregious than minimally necessary to convict him for second degree murder because he committed the crime based on the promise of money, he knew that Recinella was going to be murdered when he agreed to the drive the car, Recinella was shot "execution-style," the body was left on the side of the road, and the gun was thrown away.
For purposes of our review, we accept the Governor's finding that Montgomery's crime was sufficiently egregious to support denial of parole after the initial hearing. However, this finding does not end the analysis. "Establishing that the commitment offense involved some elements more than minimally necessary to *733 sustain a conviction is a step on the path of evaluating a prisoner's current dangerousness, but it is not the final step under the regulations. Due process affords an inmate `an individualized consideration of all relevant factors.'" (In re Tripp (2007) 150 Cal.App.4th 306, 319, 58 Cal.Rptr.3d 64, quoting In re Rosenkrantz, supra, 29 Cal.4th 616, 655, 128 Cal.Rptr.2d 104, 59 P.3d 174.)
Here, the Governor viewed the nature of the crime without considering that Montgomery was not the shooter. While an accomplice is treated the same as the perpetrator of a crime for purposes of determining guilt and imposing sentence (e.g., People v. Prettyman (1996) 14 Cal.4th 248, 259, 58 Cal.Rptr.2d 827, 926 P.2d 1013), continuing to do so in making a parole suitability determination violates the prisoner's due process right to "an individualized consideration of all relevant factors." In determining whether Montgomery poses a current public safety risk, it is certainly relevant that Montgomery refused Haigwood's offer to shoot Recinella, and did not pull the trigger, but instead sat waiting in the car for Reed to do the shooting. Coupled with the absence of any violent criminal history, his exemplary prison record and the almost unanimous opinions of prison psychologists that Montgomery poses a "low risk" for violence, the only rational conclusion is that Montgomery poses little or no threat to public safety.
Our decision conforms with most recent appellate decisions on this issue. (See, e.g., In re Elkins (2006) 144 Cal.App.4th 475, 50 Cal.Rptr.3d 503; In re Lee (2006) 143 Cal.App.4th 1400, 49 Cal.Rptr.3d 931; In re Scott, supra, 133 Cal.App.4th 573, 34 Cal.Rptr.3d 905.) With due respect to our colleagues in Division 4 of this court, we disagree with its opinion in In re Jacobson (2007) 154 Cal.App.4th 849, 65 Cal.Rptr.3d 222. "Our laws ... provide for mechanisms by which even murderers, in limited circumstances, are entitled to be paroled. The judiciary has an obligation to execute those laws." (Lee, at p. 1414, 49 Cal. Rptr.3d 931.) In our view, the Jacobson court's interpretation of "some evidence" goes beyond deference to the executive branch and is contrary to our Supreme Court's mandate in Rosenkrantz.

4. Remand to the Governor for Further Consideration is Neither Necessary Nor Appropriate
The remaining issue is whether the court should remand to the Governor to reconsider his decision. In a prior decision, we held that when granting habeas corpus relief from the Governor's reversal of a Board decision, the appropriate remedy is to allow the Governor to exercise his discretion to renew his review of the Board decision. (In re Capistran (2003) 107 Cal. App.4th 1299, 1307, 132 Cal.Rptr.2d 872.)
In this instance, however, the Governor has twice reversed the Board's recommendation based upon the same reasoning. To remand for reconsideration to the Governor would "`amount to an idle act.'" (In re Scott, supra, 133 Cal.App.4th 573, 603, 34 Cal.Rptr.3d 905; see also In re Smith (2003) 109 Cal.App.4th 489, 507, 134 Cal. Rptr.2d 781 ["Since we have reviewed the materials that were before the Board and found no evidence to support a decision other than the one reached by the Board, a remand to the Governor in this case would amount to an idle act"].)

DISPOSITION
The order granting Montgomery's petition for writ of habeas corpus is affirmed.
We concur: GILBERT, P.J., and COFFEE, J.
NOTES
[1] Montgomery was released from custody on or about August 1, 2006, following our Supreme Court's denial of the Governor's petition for writ of supersedeas and vacating a temporary stay. Montgomery remains at liberty on parole.
[2] A CDC 115 documents misconduct believed to be a violation of law, which is not minor in nature. (In re Gray (2007) 151 Cal.App.4th 379, 389, 59 Cal.Rptr.3d 724.)
[3] While Montgomery's second petition for writ of habeas corpus was pending, the Board held another parole consideration hearing in January 2006. The Board again found Montgomery suitable for parole. The Governor reversed that decision on June 2, 2006.
[4] All statutory references are to the Penal Code.
[5] Section references to the California Code of Regulations are to title 15.
[6] California Code of Regulations section 2402, subdivision (c) sets forth six factors tending to show unsuitability for parole, which include:

"(1) Commitment Offense. The prisoner committed the offense in an especially heinous, atrocious or cruel manner. The factors to be considered include:
"(A) Multiple victims were attacked, injured or killed in (he same or separate incidents.
"(B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.
"(C) The victim was abused, defiled or mutilated during or after the offense.
"(D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.
"(E) The motive for the crime is inexplicable or very trivial in relation to the offense.
"(2) Previous Record of Violence. The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age.
"(3) Unstable Social History. The prisoner has a history of unstable or tumultuous relationships with others.
"(4) Sadistic Sexual Offenses. The prisoner has previously sexually assaulted another in a manner calculated to inflict unusual pain or fear upon the victim.
"(5) Psychological Factors. The prisoner has a lengthy history of severe mental problems related to the offense.
"(6) Institutional Behavior. The prisoner has engaged in serious misconduct in prison or jail."
[7] California Code of Regulations section 2402, subdivision (d) sets forth nine factors tending to show suitability for parole, which include:

"(1) No Juvenile Record. The prisoner does not have a record of assaulting others as a juvenile or committing crimes with a potential of personal harm to victims.
"(2) Stable Social History. The prisoner has experienced reasonably stable relationships with others.
"(3) Signs of Remorse. The prisoner performed acts which tend to indicate the presence of remorse, such as attempting to repair the damage, seeking help for or relieving suffering of the victim, or indicating that he understands the nature and magnitude of the offense.
"(4) Motivation for Crime. The prisoner committed his crime as a result of significant stress in his life, especially if the stress has built over a long period of time.
"(5) Battered Woman Syndrome. At the time of the commission of the crime, the prisoner suffered from Battered Woman Syndrome ....
"(6) Lack of Criminal History. The prisoner lacks any significant history of violent crime.
"(7) Age. The prisoner's present age reduces the probability of recidivism.
"(8) Understanding and Plans for Future. The prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release.
"(9) Institutional Behavior. Institutional activities indicate an enhanced ability to function within the law upon release."