184 Cal.App.4th 670 (2010)
109 Cal.Rptr.3d 229
In re JOSEPH CALDERON on Habeas Corpus.
No. A125831.
Court of Appeals of California, First District, Division Two.
May 12, 2010.
[As modified May 18, 2010.]
*675 Michael E. Beckman for Petitioner Joseph Calderon.
Edmund G. Brown, Jr., Attorney General, Julie L. Garland, Assistant Attorney General, Anya M. Binsacca and Brian C. Kinney, Deputy Attorneys General, for Respondent the State of California.

*676 OPINION
KLINE, P.J.
On June 28, 1994, based on his plea of guilty, Joseph Calderon was convicted of murder in the second degree with the use of a firearm. He was sentenced to state prison for the indeterminate term of 18 years to life, became eligible for parole on October 18, 2005, and was denied parole earlier that year. About three years later, on June 19, 2008, the Board of Parole Hearings (Board) found Calderon suitable for parole and granted him a release date.
The Governor reviewed the Board's decision and, on November 10, 2008, reversed it. Calderon challenged the Governor's decision in a petition for writ of habeas corpus filed in the San Francisco Superior Court, which was denied by that court on July 14, 2009.
On August 21, 2009, Calderon filed a petition for writ of habeas corpus in this court, and we issued an order to show cause. Finding that the Governor's reversal of the parole date granted Calderon by the Board is not supported by any evidence, we shall grant the petition.

BACKGROUND

The Commitment Offense
At approximately 2:00 o'clock in the morning on October 11, 1993, Calderon and two friends, William Glasgow and Sergio Alarcon, were driving through the Mission District of San Francisco after leaving a nightclub where they had been drinking. While on their way home, the group decided to rob Mission News, an adult bookstore near the corner of 17th and Mission Streets. Calderon and Alarcon entered the bookstore while Glasgow remained in the car outside.[1] Calderon presented a gun and ordered the clerk to remove the money in the register. John Ybarra, a security guard seated behind a counter, arose and fired two shots at Calderon and Alarcon. The two fled and Ybarra chased them while he and Calderon exchanged gunfire. All three suffered bullet wounds and Ybarra died from his. Calderon and his friends drove to St. Luke's hospital where they were apprehended by the police.
*677 All three were arrested for the attempted robbery and the murder of Ybarra. Calderon was charged with attempted robbery and special circumstances murder, both with allegations of use of a firearm. He pled guilty to second degree murder with personal use of a firearm and, on July 27, 1994, was sentenced to 18 years to life. The charges against Alarcon and Glasgow were dismissed.

The 2008 Parole Hearing
Calderon testified at the June 19, 2008 parole hearing that he and his friends did not plan the robbery, but acted on the spur of the moment. "We were on our way home from a club. We were talking, and we had decided to do this robbery, which I now know . . . was very foolish. It justeverything kind oflike I said, it wasn't planned. It went kind of quick, and you know, today I realize, you know, if I would have thought through the consequences or what could have been, it wouldn't have happened. To speak in the mind frame of back then, as opposed to now, back then we weren't thinking. We weren't thinking."
Describing the events leading up to the murder, Calderon told the Board he and his friends had been "out drinking" and had smoked marijuana earlier in the day. Asked if he was "under the influence" at the time of the offense, Calderon said, "[a]t the time, yes, but I don'tI don't minimize my action. I accept full responsibility." Calderon repeatedly acknowledged that due to his "stupid choice," "a man was killed that night" and "[t]here's no going around that." At one point, after a member of the Board inquired about Calderon's current understanding of the consequences of his mistake and Calderon had reiterated his remorse, Calderon stated: "[E]ver since that day, all's I have done is try to grow and learn and what, you know, I ask myself, why did I do what I did, and when I found out what I did what I did [sic], then it's just likeI just feel likea man was killed because of this? Because I was struggling with issues?" Asked what these issues were, Calderon said they had their roots in the fact that he grew up in "a dysfunctional family." Acknowledging that "none of this is an excuse," Calderon added that he was about to get married, did not understand what having a normal life would be at the time, and "was dealing with a lot of insecurities and fears about both success and failure."
Calderon also recounted at some length the role alcohol played in the commission of his offense, and the extent to which alcohol and drugs negatively shaped his life. In addition to 1990 misdemeanor convictions of possession and sale of a controlled substance (cocaine and PCP), for which he was sentenced to 15 days in county jail, Calderon was convicted in 1992 of driving under the influence of alcohol or drugs, for which he was granted *678 probation. After he was convicted of reckless driving about a month later, Calderon's probation was revoked and he was sentenced to 90 days in county jail. Following his first conviction, Calderon participated in a drug diversion program that failed, according to Calderon, because it addressed "the effect of the problem" but not the source. Calderon now feels that at the time of his offenses he was using drugs and alcohol "to cover up [his] insecurities and fears." To overcome these problems, he said, "I had to do a lot more searching, and I had to find out about why I feel the way I feel and why I do the things I do." Calderon felt he had engaged in this self-examination fairly consistently while in prison and wished "I would have done it prior to this, but I had to go through life since then asking myself the whys. Why did I make that decision. Why did I do that. Why was I selfish." By asking those questions, he said, "I've come up with a way of identifying issues and my own weaknesses and not covering them up with alcohol or drugs but addressing them and recognizing them."
After the death of his father and the loss of other relatives, Calderon's life "started to have more meaning" and he "started to learn more" about himself: "[A]s each person that's close to me died, . . . I thought about my victim. . . . I wonder how my victims feel. You know, I wonder how [Ybarra's] mom feels, and I know he had a sister and a brother, and I understand that even though they died and it hurt me and I cried, I understand that their loved one didn't die. He was killed, and [the loss] has to be intensified."
When asked by a friend "if somebody killed your daughter, how would you feel," Calderon initially refused to consider such a possibility because it "scared" him, but it also made him realize that such fear "[was] the Ybarra's family reality." Calderon compared the effect of his actions to the ripple effect of throwing a stone in a pond. "[Y]ou know it has waves. . . . I've thought about, you know, Ms. Egu [(the clerk at the store)] . . . . [S]he wasn't physically harmed, but I know I harmed her. You know, anybody that was in that place, I know they were harmed."
Calderon also acknowledged to the Board the role anger had played in his life: "In terms of the crime itself, I don't know if I could say I was angry that night, but anger itself is one of the many things that I've dealt with, when I was young, especially. Now, over the years, I've learned to deal with anger, and I understand anger in itself isn't wrong. Anger in itself is just an emotion or feeling. In itself, it isn't wrong. What we decide to do with that anger can be wrong. And angerI know today, can be both positive or negative. I can use anger to change and do things better, to avoid situations, and I can alwaysI canit can actually be a positive emotion. You know, there's the thing they call `Righteous Anger,' but even with anger, and I don't know if I'm answering your question fully. It's something I've thought about. *679 Something I've dealt with along the path is I know that anger doesn't take away your decision, and anger in itself, as a feeling, isn't a wrong thing. People get angry."
This personal "searching," as Calderon repeatedly referred to his attempts to understand the causes of his criminal conduct, is evident throughout the hearing, on topics ranging from the abuse he suffered as a child to his brief membership in a prison gang. Asked about his relationship with his father, Calderon prefaced his answer by saying, "I don't have a problem speaking about any of my childhood, but please don't see that I'm making in any way making excuses. . . . I accept responsibility for what I did. . . . There was a point in my life where I really knew what was right and wrong, and I chose wrong that night, and it ended [with] a man being killed." He then explained that while he "loved [his] dad," he "understand[s] that you're only a parent one time" and "sometimes you're going to make mistakes." In answering his own hypothetical question "did I have the best childhood," he answered "probably not," and explained that there was "physical and verbal abuse" in the family, "not only amongst them to me, but them amongst themselves."
Asked whether he had been a member of a gang before entering prison, Calderon stated he had not, but that he did belong to a "graffiti crew" that called itself "Here Comes Trouble." The difference, he explained, was that "a gang represents a neighborhood," but a graffiti crew is "into art." Calderon conceded, however, that "[s]ome of the belief systems are the same." Calderon joined the graffiti crew when he was 14 or 15 and remained "associated" with it for "a couple of years."
It was not until he entered prison in 1994 that Calderon first became associated with a gangthe "Northern Structure gang"because he was "scared" of the physical assaults he might otherwise suffer from other inmates. Drawing a distinction between being an associate of the gang and an actual member, Calderon explained that he was unable to commit to the gang "100 percent" because "I didn't want to spend the rest of my life hurting people [in behalf of the gang] . . . and realized how these guys act, and sooner or later, they would have hit me even for that." A 2004 mental health evaluation of Calderon states that he responded to orders from gang leaders to assault certain inmates "by notifying the victim and staging the assaults so as not to cause harm." In 1997, Calderon formally disassociated from his gang by participating in a Department of Corrections and Rehabilitation "debriefing" program. (See Cal. Code Regs., tit. 15, § 3378, subd. (c)(2).)[2] *680 After he "debriefed," Calderon was assigned to a "sensitive needs yard" for his own protection. Since he left the gang in 1997, he has been discipline free.
Calderon has engaged in a considerable amount of self-help programming and counseling, and participated in Alcoholics Anonymous (AA) and other types of therapy. His 2004 mental health evaluation notes that Calderon was then participating "in AA type programs, particularly Christian Twelve-Steps." His 2008 forensic mental health assessment states that at that time Calderon was participating "in numerous therapeutic and self-help activities, which has included consistently attending weekly meetings of the Alcoholics Anonymous Group from October 2004 through December 2007." Calderon testified that he has "been involved with AA since 2001," and currently attends AA and "CGA" workshops.[3] At the time of the hearing, he was "in the process of training to be a facilitator for CGA," which he believed would enable him to counsel "troubled youth" upon his release from prison.
The Board noted that Calderon received certificates from several religious programs (Crossroad Bible Institute, Set Free Prison Ministries, Source of Light Ministries, and Emmaus Correspondence School of Bible) and also participated in correctional workshops that prepare inmates for parole, most recently the parole expectations workshop, job-search reentry workshop, and the parole planning workshop. Calderon also recently participated in a six-week importance of self-esteem workshop, an eight-week destructive and constructive power of belief workshop, two CGA-sponsored programs (victim's workshop, trust workshop), and an anger reduction and awareness workshop.
Calderon's primary parole plan was to move in with his ex-wife[4] and daughter, who live in a multiunit building in San Francisco owned by his ex-wife's parents. An alternative possibility available to him is to live with an aunt who also has a house in San Francisco. Calderon has been offered a job at Project Rebound, a parole program that has arranged for him to take courses in social work and business management at San Francisco State University.
Calderon's mental health evaluations, which we later discuss, have all been very favorable. Suffice it for present purposes to note that his most recent evaluation, in 2008, concludes that "current risk for future violence, if *681 paroled to the community at this time, is in the low range, when compared to other inmates." In arriving at this conclusion, the report observes that Calderon's "`exceptional' work performance, participation in numerous therapeutic activities and his lack of significant disciplinary actions during the past 12 years within [California's Department of Corrections, now California's Department of Corrections and Rehabilitation] indicates he has insight into what is needed in order to succeed."

The Board Decision
Concluding that Calderon "would not pose an unreasonable risk of danger to society or a threat to public safety if released from prison," the Board found him suitable for release on parole. Explaining its conclusion, the Board first observed that Calderon had demonstrated "an understanding of the nature and magnitude of this commitment offense," and had gained considerable insight into the factors that led to it. As the presiding member of the panel told Calderon, "you shared today with this Panel an understanding of the nature and magnitude of the commitment offense, and the Panel feels you were very truthful with us. You included all of your crime victims when you discussed this crime with us today. You have demonstrated remorse here today, and you have demonstrated that you have reviewed and you continue to delve into the causative factors for this crime, and you have spoken very articulately today about them. It appears that you have internalized the issues that were involved in this crime, and rather than just, which we often hear, parroting the remarks, like `I'm a changed man. I have changed. I am different. I'm not the man I was when I committed the crime.' The way you articulated it today, sir, which probably will not show up well in the transcript, but the way you articulated it to us today showed this Panel that you are candid and that you fully believe what you've told us."
The Board also expressed confidence that Calderon's past alcohol and drug use would not recur, noting that his "participation in AA has been continuous" and provided "tools that are going to prepare [him] for going outside, to prevent ... recidivating." The Board also commended Calderon for actively participating in numerous counseling programs, specifically mentioning anger management and reduction awareness workshops, "Crossroads and other Bible studies," and "Criminal and Gang Members Anonymous workshops"which "show[ed] a lot of effort in terms of turning [his life] around."
The Board was also impressed with Calderon's "risky" decision to end his brief gang membership, which it felt showed maturation and "some very good positive thinking." The Board felt its conclusion was also justified by the facts that Calderon's prior record was slight and nonviolent and he "had reasonably stable relationships with others."
*682 Finally, the Board felt that Calderon's parole plans were realistic, especially given his vocational training in both small engine repair and electronics.
Upon finding Calderon suitable for parole, the Board set his prison term at 15.75 years, leaving him "some time yet to serve," and imposed a "special condition of parole" that he is "not [to] use or possess alcoholic beverages" and is to "[s]ubmit to alcohol[] testing."

The Governor's Reversal
Noting that he relied in part on the "gravity" of Calderon's crime, the Governor stated that he was "particularly troubled" by two postconviction factors: "the evidence that Mr. Calderon continued his criminal behavior while in prison and that he still lacks full insight into the effect of his substance abuse."
The Governor felt Calderon's commitment offense was "especially atrocious because [the bookstore clerk] was threatened with a gun and was ordered to remove money from the register, after which Mr. Ybarra was shot to death." After citing the multiple victims (the store clerk and Ybarra), the Governor attached significance to the facts that Calderon "had the opportunity to avoid the life offense," that "[h]is actions demonstrated an exceptionally callous disregard for human life and suffering, and his motive for the crimerobbing the store for financial gainwas extremely trivial in relation to the magnitude of the crime he committed."
The Governor's conclusion that Calderon "continued his pattern of criminal conduct during incarceration" was based on evidence that he "associated with Northern Structure prison gang after he entered prison." The Governor also attached significance to the fact that, though at the 2008 parole hearing Calderon "denied being a gang member" before entering prison, "the record indicates that before he came to prison, Mr. Calderon was an associate of the San Francisco Mission gang" and Calderon "admitted to the Board that he was part of a `graffiti crew,' and [he] used the tag `Here Comes Trouble.'"
The factor the Governor relied upon most heavily, however, was that Calderon's own statements conflict with one another and demonstrate that he "lacks full insight into the effect of his substance abuse." With respect to this issue, the Governor stated as follows: "According to his recent Board reports, Mr. Calderon admits to `experimenting' with alcohol and other drugs. However, he admitted to the probation officer that he `abuses alcohol when he drinks.' He admitted that he began to drink when he was a teenager. The day of Mr. Ybarra's murder, Mr. Calderon said that he was hanging out with a friend, smoking marijuana and drinking `a bit.' He ended up going to a party *683 while he was `drunk.' Although he told his 2008 mental health evaluator that alcohol has never caused problems for him at work, school or in his social life, it was a factor in the life offense, and in his earlier conviction for driving under the influence." The Governor also pointed out that Calderon "admits that he began smoking marijuana at age 12, and acknowledges `heavy' daily use of the drug for about one year prior to the life offense. He also admitted use of LSD, `psychedelic' mushrooms, PCP, crack cocaine and methamphetamine." Moreover, the Governor stated, "Mr. Calderon's participation in self-help and therapy programs during his incarceration has been sporadic."
For the foregoing reasons, the Governor concluded that Calderon's release from prison on parole "would pose an unreasonable risk of danger to society at this time," and reversed the Board's decision granting parole.

DISCUSSION
(1) The state may not deprive any person of life, liberty, or property without due process of law. (U.S. Const., 14th Amend., § 1; Cal. Const., art. I, § 7.) "[T]he due process clause requires, among other things, that the factual basis of a decision by the Board [or Governor] denying parole must be premised upon some evidence relevant to the factors the Board is required to consider." (In re Rosenkrantz (2002) 29 Cal.4th 616, 663 [128 Cal.Rptr.2d 104, 59 P.3d 174].) In summarizing the due process that must be accorded a prison inmate eligible for release on parole, our Supreme Court has made clear that the Board and the Governor exercise greatbut not unboundeddiscretion: "the Board `shall normally set a parole release date' one year prior to the inmate's minimum eligible parole release date, and shall set the date `in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public ....' ([Pen. Code,] § 3041, subd. (a), italics added.) Subdivision (b) of section 3041 provides that a release date must be set `unless [the Board] determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting.' [Citation.]" (In re Lawrence (2008) 44 Cal.4th 1181, 1201-1202 [82 Cal.Rptr.3d 169, 190 P.3d 535] (Lawrence).) (2) In making that determination, "[t]itle 15, section 2281 of the California Code of Regulations [(Regs., § 2281)] sets forth the factors to be considered by the Board in carrying out the mandate of the statute. The regulation is designed to guide the Board's assessment of whether the inmate poses `an unreasonable risk of danger to society if released from prison,' and thus whether he or she is suitable for parole. (Regs., § 2281, subd. (a).) The regulation also lists several circumstances relating to unsuitability for parole ... and the mitigating circumstances of the crime. *684 (Regs., § 2281, subd. (d).) Finally, the regulation explains that the foregoing circumstances `are set forth as general guidelines; the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel.' (Regs., § 2281, subds. (c), (d).)" (Lawrence, at pp. 1202-1203, fns. omitted.)
(3) The regulatory factors include "`the circumstances of the prisoner's: social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release. Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability.' (Regs., § 2281, subd. (b).)" (Lawrence, supra, 44 Cal.4th at p. 1202, fn. 6.)
(4) The factors showing an inmate unsuitable for release on parole "are: (1) a commitment offense carried out in an `especially heinous, atrocious or cruel manner'; (2) a `[p]revious [r]ecord of [v]iolence'; (3) `a history of unstable or tumultuous relationships with others'; (4) `[s]adistic [s]exual [o]ffenses'; (5) `a lengthy history of severe mental problems related to the offense'; and (6) `[t]he prisoner has engaged in serious misconduct in prison or jail.' (Regs., § 2281, subd. (c)(1)-(6).) This subdivision further provides that `the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel.' (Regs., § 2281, subd. (c).)" (Lawrence, supra, 44 Cal.4th at p. 1202, fn. 7.)
(5) On the other hand, factors showing an inmate suitable for release "are: (1) the absence of a juvenile record; (2) `reasonably stable relationships with others'; (3) signs of remorse; (4) a crime committed `as the result of significant stress in [the prisoner's] life'; (5) battered woman syndrome; (6) the lack of `any significant history of violent crime'; (7) `[t]he prisoner's present age reduces the probability of recidivism'; (8) `[t]he prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release'; and (9) the inmate's `[i]nstitutional activities indicate an enhanced ability to function within the law upon release.' (Regs., § 2281, subd. (d)(1)-(9).)" (Lawrence, supra, Cal.4th at p. 1203, fn. 8.)[5]
(6) The Governor may conduct a de novo review of the Board's decisions on the basis of the same factors the Board is required to consider. *685 (Lawrence, supra, 44 Cal.4th at p. 1203, fn. 9; Cal. Const., art. V, § 8, subd. (b); Pen. Code, § 3041.2.) "As long as the Governor's decision reflects due consideration of the specified factors as applied to the individual prisoner in accordance with applicable legal standards, the court's review is limited to ascertaining whether there is some evidence in the record that supports the Governor's decision." (In re Rosenkrantz, supra, 29 Cal.4th at p. 677.) It is clear, however, that "the aggravated nature of a commitment offense does not, in every case, provide relevant evidence that an inmate remains dangerous, and a focus upon the egregiousness of the commitment offense to the exclusion of other relevant evidence has proved in practice to obscure the core statutory emphasis upon current dangerousness ...," and the relevant inquiry is therefore "`whether the circumstances of the commitment offense, when considered in light of other facts in the record, are such that they continue to be predictive of current dangerousness many years after commission of the offense. This inquiry is, by necessity and by statutory mandate, an individualized one, and cannot be undertaken simply by examining the circumstances of the crime in isolation, without consideration of the passage of time or the attendant changes in the inmate's psychological or mental attitude.'" (In re Shaputis (2008) 44 Cal.4th 1241, 1254-1255 [82 Cal.Rptr.3d 213, 190 P.3d 573], italics added (Shaputis).)
(7) Lawrence and Shaputis instruct that, in reviewing parole determinations by the Governor, "[o]ur deferential standard of review requires us to credit the Governor's findings if they are supported by a modicum of evidence. [Citation.] This does not mean, however, that evidence suggesting a commitment offense was `especially heinous' or `particularly egregious' will eternally provide adequate support for a decision that an inmate is unsuitable for parole.... [T]he Legislature specifically contemplated both that the Board `shall normally' grant a parole date, and that the passage of time and the related changes in a prisoner's mental attitude and demeanor are probative of the determination of current dangerousness." (Lawrence, supra, 44 Cal.4th at p. 1226.)
In other words, as we have previously observed, the exceedingly deferential nature of the "`some evidence'" standard does not convert a reviewing court "`into a potted plant.'" (Lawrence, supra, 44 Cal.4th at pp. 1211-1212, quoting In re Scott (2004) 119 Cal.App.4th 871, 898 [15 Cal.Rptr.3d 32] (Scott II).) We must ensure that the denial of parole is based on "some evidence" of current dangerousness. "[S]uch evidence `"must have some indicia of reliability."'" (Scott I, at p. 899.) "[T]he `some evidence' test may be understood as meaning that suitability determinations must have some rational basis in fact." (In re Scott (2005) 133 Cal.App.4th 573, 590, fn. 6 [34 Cal.Rptr.3d 905] (Scott II).) As Justice Moreno stated neatly in his concurring opinion in Lawrence: "a parole date shall normally be granted except when some evidence of current dangerousness, after considering the totality of the *686 circumstances, justifies denial of parole." (Lawrence, supra, 44 Cal.4th at p. 1230 (conc. opn. of Moreno, J.), italics added.)
The Governor's reversal of Calderon's parole does not survive scrutiny under the foregoing principles.

No Evidence Shows the Commitment Offense Predictive of Calderon's Current Dangerousness
(8) The commitment offense is one of only two factors indicative of unsuitability a prisoner cannot change (the other being his prior record of violence), and reliance on such an immutable factor may therefore be unfair and contrary to the rehabilitative goals of our penal system and the requirements of due process. (Scott II, supra, 133 Cal.App.4th at pp. 594-595.) "The commitment offense can negate suitability only if circumstances of the crime reliably established by evidence in the record rationally indicate that the offender will present an unreasonable public safety risk if released from prison," keeping in mind that "the predictive value of the commitment offense may be very questionable after a long period of time." (Id. at p. 595, fn. omitted; accord, Lawrence, supra, 44 Cal.4th at pp. 1219-1221.)
As noted, the Governor found the second degree murder for which Calderon was convicted "especially atrocious" because the clerk of the store "was threatened with a gun and was ordered to remove money from the register, after which Mr. Ybarra was shot to death. Thus, the crime involved multiple victims." The Governor also felt Calderon's actions "demonstrated an exceptionally callous disregard for human life and suffering, and his motive for the crimerobbing the store for financial gainwas extremely trivial in relation to the magnitude of the crime he committed."
(9) What the Governor said about Calderon's offense can be said about many and probably most second degree murders. Victims of such homicides are invariably threatened with a gun or some other deadly weapon and regularly instructed to turn over money, and the motive for the crime is frequently related to financial gain, a purpose always "trivial" when measured against the taking of a human life. Moreover, all persons convicted of second degree murder may be said to have "had the opportunity to avoid the life offense" and viciously declined to take it. As one court has said, second degree murder is defined as the unlawful killing of a human being with malice aforethought, and "[m]alice itself involves `"an element of viciousnessan extreme indifference to the value of human life."' [Citation.] Thus, all second degree murders will involve some amount of viciousness or callousness. [Citation.]" (In re Weider (2006) 145 Cal.App.4th 570, 587 [52 Cal.Rptr.3d 147].) As pointed out in Lawrence, "there are few, if any, murders *687 that could not be characterized as either particularly aggravated, or as involving some act beyond the minimum required for conviction of the offense," so that "a strict minimum elements inquiry [by a reviewing court] would mandate upholding in every case the denial of parole, regardless of whether other evidence in the record clearly attenuates the predictive value of the offense, and without any consideration of whether the gravity of the offense continues to provide some evidence that the inmate remains a threat to public safety many years after commission of his or her offense." (Lawrence, supra, 44 Cal.4th at p. 1218.) (10) As our high court has made clear, at some point, "when there is affirmative evidence, based upon the prisoner's subsequent behavior and current mental state, that the prisoner, if released, would not currently be dangerous, his or her past offense may no longer realistically constitute a reliable or accurate indicator of the prisoner's current dangerousness." (Id. at p. 1219, italics added.) Therefore, "when evaluating whether an inmate continues to pose a threat to public safety, both the Board and the Governor must consider all relevant statutory factors, including those that relate to postconviction conduct and rehabilitation." (Ibid., italics added.)

The Postconviction Factors the Governor Relied Upon Do Not Provide Evidence Calderon Is Currently Dangerous
The Governor's finding that Calderon currently poses a threat to public safety is based upon two postconviction factors: that Calderon (1) "continued his pattern of criminal conduct during incarceration," and (2) "lacks full insight into the effect of his substance abuse." As will be seen, there is no evidence Calderon engaged in any criminal conduct while incarcerated, let alone a nexus between such conduct and his current dangerousness. Furthermore, as we shall explain, the record does not establish that Calderon lacks insight into the effect of his past substance abuse; all of the evidence is to the contrary.
With respect to the first factor"that Mr. Calderon continued his pattern of criminal conduct during his incarceration"the Governor's conclusion is based on the belief that "before he came to prison, Mr. Calderon was an associate of the San Francisco Mission gang" and "continued such criminal conduct" when he "associated with the Northern Structure prison gang after he entered prison." So far as the record shows, correctional authorities only learned of Calderon's association with a prison gang at the time he disassociated himself from the Northern Structure prison gang and sought their protection from the violent retribution he expected from members of this gang. The Board lauded Calderon for what it considered a sensible and courageous act. As the presiding member of the Board told Calderon at the hearing, "unlike some people who come in and spend a long time of inside *688 involvement with gangs ..., you got a clue very early, it appears early on, and you turned your life around. That was very impressive to this Panel that you chose to drop out at a very early stage of things and maintained that knowing how risky ... it would be to you and remains to you and will be for some time." Moreover, as the Board also noted, since quitting the gang 12 years earlier, Calderon has been totally disciplinary free.
(11) The inference of dangerousness the Governor draws from Calderon's brief association with a prison gang many years ago cannot be judicially countenanced. It is based not on reason but "`"`"on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work." [Citation.] ...' [¶] `A finding of fact must be an inference drawn from evidence rather than ... a mere speculation as to probabilities without evidence....' [Citation.]"'"' [Citation.]" (California Shoppers, Inc. v. Royal Globe Ins. Co. (1985) 175 Cal.App.3d 1, 45 [221 Cal.Rptr. 171], quoting Brautigam v. Brooks (1964) 227 Cal.App.2d 547, 556-557 [38 Cal.Rptr. 784]; accord, People v. Morris (1988) 46 Cal.3d 1, 21 [249 Cal.Rptr. 119, 756 P.2d 843], overruled on other grounds in In re Sassounian (1995) 9 Cal.4th 535, 543-544, fn. 5 [37 Cal.Rptr.2d 446, 887 P.2d 527].)
Thus we turn to the remaining factor the Governor relied upon, and the one to which the Attorney General attaches greatest significance: "that Mr. Calderon lacks full insight into the effects of his substance abuse."
Preliminarily, it is worth noting that the portion of the Governor's written decision explaining Calderon's asserted lack of insight (set forth, ante, at pp. 682-683) relies entirely on Calderon's voluntary "admissions" regarding past substance abuse that he made to those who periodically evaluated his mental health and to the Board. As indicated, one of the reasons the Board was impressed with Calderon and granted him a parole date was the apparent depth and honesty of his self-examination and the candidness of his self-disclosures, particularly with respect to his alcohol and drug abuse, which Calderon clearly recognized as a cause of his criminal conduct. By punishing Calderon for the forthrightness the Board rewarded, the Governor creates a Catch-22; a situation that may well chill the willingness of life prisoners to be candid with the Board.
In any case, the Governor's perception of Calderon's lack of insight has no basis at all in the record.
Before explaining why, we think it appropriate to comment on the weight placed by the Governor on Calderon's asserted "lack of insight." Before August 21, 2008, the date Lawrence, supra, 44 Cal.4th 1181 and Shaputis, supra, 44 Cal.4th 1241 were decided, virtually all decisions of the Board and *689 Governor denying parole relied primarily on the gravity of the commitment offense. (See Lawrence, at p. 1206 [noting "the practical reality that in every published judicial opinion [reviewing a parole decision], the decision of the Board or the Governor to deny or reverse a grant of parole has been founded in part or in whole upon a finding that the inmate committed the offense in an `especially heinous, atrocious or cruel manner'"].) In the aftermath of Lawrence and Shaputis, the denial of parole now seems usually based, at least in part, upon the inmate's asserted "lack of insight" in some respect, which has become the new talisman.
(12) The intensified interest in this very subjective factorwhich is not among the criteria indicative of unsuitability for release on parole set forth in the governing regulations (Regs., §§ 2281, 2402)derives, of course, from the Supreme Court's opinion in Shaputis, in which the Governor's reversal of an award of parole was upheld because his reliance on the gravity of the inmate's commitment offense was coupled with concern about the inmate's "lack of insight into the murder and into the years of domestic violence that preceded it." (Shaputis, supra, 44 Cal.4th at p. 1258.) The weight placed on this factor by the Shaputis court has stimulated far greater use of it by the Board and Governor than was formerly the case.[6] Considering that "lack of insight" is not among the factors indicative of unsuitability for parole specified in the sentencing regulations and has been rarely relied upon by the Board or Governor in the past, the increasing use of this factor is likely attributable to the belief of parole authorities that, as in Shaputis, "lack of *690 insight" is more likely than any other factor to induce the courts to affirm the denial of parole. But the incantation of "lack of insight," a more subjective factor than those specified in the regulations as indicative of unsuitability, has no talismanic quality. Like all evidence relied upon to find an inmate unsuitable for release on parole, "lack of insight" is probative of unsuitability only to the extent that it is both (1) demonstrably shown by the record and (2) rationally indicative of the inmate's current dangerousness.
That was clearly the case in Shaputis. Despite powerful evidence he killed his wife intentionally, Shaputis still claimed the shooting was accidental. In addition to his unjustified denial of personal responsibility, a recent psychological assessment explained why Shaputis "seemed to have `limited ... insight' regarding his antisocial behavior and the circumstance that his history of alcohol abuse was closely associated with his history of domestic violence." (Shaputis, supra, 44 Cal.4th at p. 1251.) The fact of Shaputis's "lack of insight" and its rational connection to his current dangerousness have no counterpart in this case. Indeed, the connection to current dangerousness is not even at issue because the fact that Calderon "lacks full insight into the effect of his substance abuse" cannot be established by the record. Unlike Shaputis, Calderon has never denied full responsibility for his crime and there is no evidence he lacks insight into its causes; indeed, the evidence is all to the contrary.
It is hard to know exactly what the Governor means by Calderon's "lack of full insight" (italics added), as "insight" is an inherently subjective phenomenon. Because an inmate cannot be held to the psychosensory standards applicable to a Sufi master, we assume the Shaputis court assigned the word "insight" its ordinary meaning, which is "perception," "discernment," or "[understanding." (7 Oxford English Dict. (2d ed. 1989) p. 1026.) So that by saying Calderon lacks "full insight" into the role substance abuse played in the commission of his crime, the Governor presumably means only that, because Calderon does not adequately understand the role substance abuse played in the commission of his crime, he fails to appreciate the need to address his substance abuse problem and therefore has not done so, and this failure renders him presently dangerous. This reasoning has no support in the record.
As earlier described, Calderon fully acknowledged at the 2008 hearing the role alcohol played in the commission of his offense, and the extent to which alcohol and drugs negatively affected his life at the time of his offense. The record shows that he has long been aware of this problem and diligently addressed it over a period of many years. The earliest psychological assessment of Calderon contained in the record is the mental health evaluation prepared for the Board of Prison Terms in 2004. In support of its conclusion *691 that Calderon then posed "a low risk for re-offense if released to the free community," the report noted, among many other things, that as a result of "work[ing] on his substance abuse issues while in prison," which included 12-step programs and other forms of "mental health treatment for personal issues," Calderon had "matured considerably" while in prison. This finding is repeated in all subsequent evaluations of Calderon. The record is also replete with favorable "chronos" commending Calderon for "consistently attend[ing] weekly meetings of the `B' Facility Alcoholics Anonymous Group," all of which note the depth of "his commitment to recovery from substance abuse."
The most recentand by far the most thoroughevaluation of Calderon is the 10-page forensic mental health assessment conducted on April 18, 2008, by forensic psychologist Steven Barron. This report was based not only on Dr. Barron's two lengthy interviews of Calderon, but also on his assessment of numerous "collateral sources," such as Calderon's CDCR (California's Department of Corrections and Rehabilitation) central file, CDCR unit health record, all previous forensic mental health assessments of Calderon, the transcript of his first Board hearing, the probation officer's report, the institutional staff recommendation summary, the life prisoner evaluation of Calderon, and his life prisoner postconviction progress report. Additionally, Dr. Barron utilized two "empirically based guides concerning the risk for future violence," namely "the Psychopathy Checklist-Revised (PCL-R), 2nd Edition and the Historical-Clinical-Risk Assessment-20 (HCR-20)."
Under the heading "Insight/Self-Assessment," Dr. Barron states that when he asked Calderon to describe what he felt caused the trouble he has experienced in his life, particularly his substance abuse, "[h]e said, `Bad decisions, not thinking first, not understanding what the consequences of that could be.'" When asked if there was any treatment or self-help he thought he could benefit from, Calderon said, "`Continue what I am doing,'" and then related the numerous alcohol and other substance abuse programs he had been participating in for more than a decade. Dr. Barron's report notes that "Calderon has been involved in numerous activities designed to ameliorate [his] criminal, psychological, social, and vocational problems, which have included his work assignment, attendance at Alcoholic Anonymous [and CGA workshops]." When asked about his relapse prevention plan for substance abuse, Calderon "reported he intended to remain abstinent, `continue AA,' and `expand CGA' into the community, and `if not, a similar group.' Further, he stated `none of my family members use. I'm not going to use;' and added that he would `stay away from situations' which could lead to substance abuse."
When Barron asked how he planned to cope with stress and frustration if released, Calderon stated he would try to "`[s]tay ahead of my thoughts' and *692 engage in `positive ways of expressing myself.'" When asked what happens when he becomes angry, he said, "`I think about why.'" When asked what happened the last time he got angry, Calderon said that when a friend with whom he was playing cards offended him "he just told the individual how he felt and added, `I don't get mad.'" Calderon also said that "outside of childhood he does not have a history of losing control when angry."
When asked by Dr. Barron to state how he currently felt about himself, Calderon said, "`I feel a lot better about myself. I'm ready to be an asset to society. I feel good about myself.'" Stating that he did not feel good about his crime, Calderon acknowledged "`I hurt a lot of people,' including the victim's family for whom he stated, `I feel bad. I know I've hurt them.' When asked who is to blame for the crime he said `myself.' He continued, `It wasn't my intention, but that doesn't change the outcome. I accept the responsibility.'"
On the basis of his review of all information bearing upon Calderon's "lifetime functioning"including his PCL-R score, which showed a lower potential for violence than 96 percent of North American male offenders Dr. Barron concluded, as did every other expert and correctional official who had recently evaluated him, that "Mr. Calderon's current risk for future violence, if paroled to the community at this time, is in the low range, when compared to other inmates."
The Governor's conclusion that Calderon is currently dangerous due to his lack of insight into the effects of his past substance abuse wholly ignores the evidence we have just described, which is essentially uncontradicted, and thereby distorts the record. The Governor's assertion that Calderon's participation in self-help and therapy programs was "sporadic" is an invention. Calderon's chronos and the psychological assessments all emphasize that his attendance at weekly AA meetings was "consistent" and his participation in discussions "active." The only indications in the record that Calderon's program participation ended prematurely attribute the problem to "budget constraints" or the lack of "grant money," not to any failure of commitment on the part of Calderon.
In short, what was said of the inmate in In re Smith (2003) 114 Cal.App.4th 343, 371 [7 Cal.Rptr.3d 655], can also be said of Calderon. The record provides no reasonable grounds to believe he might start using drugs or alcohol if released. There is no evidence his former desire for drugs or alcohol might still be a motivating force. The record reveals he has been clean and sober for a substantial period of time relative to the duration of his abuse. There is no evidence Calderon denies he had a drug or alcohol problem or denied he had a problem for some period of his incarceration. *693 There is no evidence he refused, failed, or did poorly in drug treatment programs. And there is no evidence that Calderon ever used any type of illicit substance during his incarceration. Nor does the record support a reasonable belief that without further drug treatment in prison, Calderon might resume taking drugs or using alcohol. Indeed, also as in In re Smith, "the Governor neither refers to nor considers in his decision the undisputed evidence before the Board that is inconsistent with a finding that [Calderon] needs more treatment in prison or that he might start using drugs [or alcohol] again if released." (In re Smith, at p. 371.)
If Calderon's insight into the effect of his past substance abuse is insufficient, it is difficult to imagine that many or indeed any inmates could demonstrate the epiphany the Governor seemingly requires. The understanding Calderon has shown about his past substance abuse is unquestionably greater than the "rather rudimentary level of insight" deemed sufficient to justify release in In re Roderick (2007) 154 Cal.App.4th 242, 271 [65 Cal.Rptr.3d 16]. Over a very long period of time, Calderon has actively and productively participated in virtually every substance abuse and other self-help program made available to him by prison authorities. Mental health experts and members of the Board who, unlike the Governor and his staff, personally interacted with Calderon, have uniformly determined that he has engaged in genuine and lengthy self-examination, accepts personal responsibility for his crime, has over the years of his imprisonment gained insight into the causes of his criminal conduct, including his past substance abuse, and that as a result of all of these factors he does not present a current danger to the public and is suitable for parole. It bears noting that the only one of the nine regulatory factors indicating suitability for release on parole (Regs., § 2281, subd. (d)(1)-(9)) that does not apply to Calderon is that relating to inmates who suffered battered woman syndrome. Like the petitioner in Lawrence, supra, 44 Cal.4th 1181, Calderon's extraordinary rehabilitative efforts were specifically tailored to address the circumstances that led to his commitment offense, including substance abuse and anger management. So far as can be known from the record, these efforts have led to "substantial insight on [his] part into both the behavior that led to the murder and [his] own responsibility for the crime." (Id. at p. 1226.)
(13) The record provides no rational basis upon which to conclude Calderon is blind to the problem presented by his past substance abuse or has refused to confront the problem, nor reason to believe Calderon is likely to resume abusing alcohol and drugs after more than 12 years of active participation in AA and sobriety. (14) Further, past alcohol or drug abuse "does not constitute some evidence that [an inmate] might start using drugs and become violent again, and therefore that he currently poses an unreasonable risk of danger without further treatment. Indeed, if [an inmate's] past use of drugs did invariably establish his unsuitability, then the Governor could *694 deny parole for the rest of [that inmate's] life based on this immutable factor, without regard to or consideration of subsequent circumstances and evidence indicating that he has no current desire for drugs and that there is little current likelihood of drug relapse, let alone a return to violent conduct as a result of it." (In re Smith, supra, 114 Cal.App.4th at p. 372.)
Like many of the other cases in which gubernatorial reversals of a Board grant of parole were found to be based upon mischaracterizations of the record and set aside (see, e.g., In re Loresch (2010) 183 Cal.App.4th 150; In re Moses (2010) 182 Cal.App.4th 1279 [106 Cal.Rptr.3d 608]; In re Juarez (2010) 182 Cal.App.4th 1316 [106 Cal.Rptr.3d 648]; In re Vasquez (2009) 170 Cal.App.4th 370 [87 Cal.Rptr.3d 853]; In re Aguilar (2008) 168 Cal.App.4th 1479 [86 Cal.Rptr.3d 498]; Scott II, supra, 133 Cal.App.4th 573; In re Smith (2003) 109 Cal.App.4th 489 [134 Cal.Rptr.2d 781]; In re Capistran (2003) 107 Cal.App.4th 1299 [132 Cal.Rptr.2d 872]; Styre v. Adams (E.D.Cal. 2009) 635 F.Supp.2d 1166; McCarns v. Dexter (C.D.Cal. 2008) 534 F.Supp.2d 1138), this case provides reason to wonder whether the Governor's decision is not the product of "an individualized consideration of all relevant factors" (In re Rosenkrantz, supra, 29 Cal.4th at pp. 655, 677), but of a political calculation (id. at pp. 683-686; In re Smith, supra, 114 Cal.App.4th at pp. 362-363).[7] In McCarns v. Dexter, supra, 534 F.Supp.2d 1138, the inmate contended that "`[The Board] and the Governor's staff write all of the "Governor's" decisions, by preparing a list of all conceivably negative facts and non-"facts" concerning the commitment offense that omit most parole-favorable evidence on which the [Board] panel based its decision to grant *695 parole. The Governor or a designated member of his staff signs the report but the Governor does not personally review, as required, all or any of the materials reviewed by the [Board] panel that granted parole. Governor Schwarzenegger's only involvement is to sign or designate a staff member to sign the report.'" (Id. at p. 1155, fn. 7.) Relying on the presumption of regularity supporting the official acts of public officers and the inmate's failure to present competent evidence that the Governor did not personally review his prison records, the court rejected the claim (id. at p. 1155) (though it nevertheless granted relief on the ground that no evidence supported the Governor's denial of parole). Calderon does not make this claim, and we therefore need not decide it. We cannot, however, deny as judges what we know as people. The Governor of a state with a population of approximately 36,000,000 and a gross national product higher than that of all but seven nations, cannot conceivably become personally familiar with the hundreds of inmate records annually presented him for review and action pursuant to article V, section 8, subdivision (b) of the California Constitution and Penal Code sections 3041.1 and 3041.2. (As earlier noted, in 2009 Governor Schwarzenegger was presented 454 cases for review and action; he reversed 285, affirmed none, modified 2, requested en banc rulings from the Board in 49, and declined to review 118.)[8] The Governor's decisions are undoubtedly written for him by his legal staff, who are or should be familiar with the administrative record and the constitutional significance of the liberty interest that is at stake. They should also be familiar with the governing law.
Because the Legislature clearly intended that inmates serving indeterminate terms shall "normally" receive a parole date "[o]ne year prior to the inmate's minimum eligible parole release date" (Pen. Code, § 3041, subd. (a)), courts say that parole is, at least in law, "the rule, rather than the exception" (In re Smith, supra, 114 Cal.App.4th at p. 366). It is increasingly impossible for the courtsor any informed personto continue to believe the law governs the reality; which is why trial and appellate courts are with increasing frequency "overruling" gubernatorial reversals of Board grants of parole. (In re Loresch, supra, 183 Cal.App.4th at pp. 163-164.) That courts now feel it necessary tovery uncommonly"implore" the Governor and his staff to pause and reflect upon the "miniature constitutional crises" they foist upon the judiciary in these cases (id. at p. 163) illustrates the magnitude of the problem.

*696 DISPOSITION
The petition for writ of habeas corpus is granted. The Governor is hereby ordered to vacate his decision of November 10, 2008, which reversed the Board's June 2008 grant of parole. The Board's June 2008 grant of parole is reinstated.
Lambden, J., and Richman, J., concurred.
NOTES
[1] Calderon testified that Alarcon went into the store with him while the probation report indicates that the store clerk identified Glasgow as one of the robbers. As Alarcon and Calderon were wounded in the exchange of gunfire, it would appear that those two went in the store, not Calderon and Glasgow. This discrepancy, however, is irrelevant to our inquiry here.
[2] All further references to title 15, California Code of Regulations, will be to "Regs.," followed by the section number.
[3] CGA is a 12-step program called "Criminals & Gangmembers Anonymous."
[4] Calderon was engaged at the time of the commitment offense and married the woman while in jail; they had a daughter together (the daughter was 14 at the time of the hearing). They have since divorced, but remain romantically involved and Calderon describes her as his best friend. She supports his parole.
[5] The factors set forth in section 2402, which pertain to murders committed on or after November 8, 1978, and specified attempted murders, are identical those set forth in Regs. section 2281. The reasons the same provisions are repeated are set forth in Regs. section 2400.
[6] Our analysis of published and unpublished appellate opinions indicates that between July 1, 1977, the effective date of the determinate sentencing law, and August 21, 2008, the date Shaputis was decidedwhich is 31 yearsthe phrase "lack of insight" appeared in only six cases. By contrast, in 2009, the first calendar year after Shaputis, "lack of insight" was employed 12 times, twice as often as it had been relied upon by the Board and Governor during the more than three decades preceding Shaputis. (The Governor did not have power to reverse a decision of the parole authority under art. V, § 8, subd. (b) of the Cal. Const. until the voters enacted Prop. 89 at the Nov. 8, 1988 election.)

Data released by the Governor indicates the new trend even more dramatically. Analysis of the Executive Report on Parole Review Decisions issued annually by the Governor's Office shows that in 2007, the year before Shaputis was decided, Governor Schwarzenegger received 172 parole cases from the Board, affirmed none, declined to review 37, modified two, requested en banc rulings from the Board in 18, and reversed 115. The Governor's reversals referred to lack of "insight" only 16 times. (Governor Schwarzenegger apparently declines to review all cases in which the Board has denied parole (see, post, at p. 695, fn. 8).) In 2008, the Governor received 170 cases from the Board, affirmed one, declined review in 55 cases, requested en banc rulings in 33, and reversed Board grants of parole in 81. Due apparently to the issuance of Shaputis in August of that year, the Governor referred to lack of "insight" into life offenses in 42 of the reversals and 16 of the en banc referrals, or 50 percent of these cases. In 2009, the Governor received 454 cases from the Board, affirmed none, declined to review 118, modified two, requested en banc rulings in 49, and reversed grants of parole in 285 cases. The Governor referred to the inmate's lack of "insight" into the life offense in 229 of the reversals and 32 of the en banc referrals, or 78 percent of these cases.
[7] Calderon does not present this claim, presumably because of the difficulty of proof. In In re Rosenkrantz, supra, 29 Cal.4th 616, the trial court had found that in reversing a Board grant of parole then Governor Gray Davis applied a blanket no-parole policy and therefore did not engage in an individualized consideration of the factors relating to Rosenkrantz's suitability for release on parole. The trial court based this finding not just on public statements by Governor Davis to the effect that convicted murderers should serve life terms without exception, but also statistical evidence. From January 1999 through April 2001, the Board held 4,800 parole hearings, granted parole to only 48 inmates (1 percent), and the Governor reversed all but one of them. Thereafter the Governor allowed one more grant of parole by the Board. The two paroles the Governor countenanced both involved women who murdered husbands who had abused them. (Id. at pp. 683-685.) The Supreme Court found the foregoing evidence insufficient to show a no-parole policy, stating that "[e]ven if the quotations in the above newspaper article accurately reflected the views the Governor held at the time the statements were made, the Governor's subsequent actions, both in granting parole in some instances and in providing individualized analyses for each of his parole decisions in the cases that have come before him, belie the claim that the Governor has adopted a blanket policy of denying parole without regard to the circumstances of the particular case." (Id. at p. 685.)

The court in In re Smith, supra, 114 Cal.App.4th 343, was similarly unimpressed with a declaration of the Board chairman, presumably under penalty of perjury, that "then Governor Pete Wilson had a no-parole policy ..." and a report from the Legislative Analyst's Office inferring such a policy "from the Governor's public statements and failure to explain statistical information showing a reduction in parole releases from 1989-1999." (Id. at p. 363.)
[8] Gubernatorial review is not mandated. Article V, section 8, subdivision (b) of the California Constitution provides that no decision of the parole authority shall become effective for a period of 30 days, "during which the Governor may review the decision subject to procedures provided by statute." (Italics added.) Penal Code section 3041.1 provides that "[u]p to 90 days prior to a scheduled release date, the Governor may request review of any decision by a parole authority concerning the grant or denial of parole to any inmate in a state prison." (Italics added.)